NOT FOR PUBLICATION

FILED & ENTERED

MAR 29 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Reaves    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>AURORA ALBERT,<br><br>Debtor. | Case No.: 1:14-bk-11524-MB<br><br>Chapter 7<br><br>Adv. Proc. No.   1:14-ap-01134-MB |
| ALLEN PAREDES  & DAISY PAREDES,<br><br>Plaintiffs,<br><br>vs.<br><br>AURORA ALBERT,<br><br>Defendant. | **MEMORANDUM OF DECISION FOLLOWING TRIAL** |

1   On May 23, 2017 through May 25, 2017, the Court conducted a trial in this adversary

2   proceeding.   Dennis Connelly represented plaintiffs Allen Paredes and Daisy Paredes (collectively

3   "Paredes" or the "Plaintiffs").  Marvin Levy represented defendant Aurora Albert ("Albert" or the

4   "Defendant"), the chapter 7 debtor herein.  This memorandum constitutes the Court's findings of

5   fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

6   Plaintiffs object to Defendant's discharge pursuant to Bankruptcy Code sections 727(a)(2)

7   and (a)(4).  Plaintiffs also allege pursuant to Bankruptcy Code section 523(a)(2) that Defendant

8   owes them a debt that is not subject to discharge, for money loaned, under "false pretenses, a false

9   representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A).

10   For the reasons set forth herein, the Court finds that Plaintiffs have met their burden on the

11   causes of action under Bankruptcy Code sections 727(a)(2) and 727(a)(4).  Accordingly, the Court

12   will enter judgment in favor of Plaintiffs denying Debtor's discharge under those statutes.  The

13   Court, however, finds that Plaintiffs have not met their burden to establish the existence of a

14   nondischargeable debt under Bankruptcy Code section 523(a)(2)(A).  On that claim the Court will

15   enter judgment in favor of Defendant.[1]

16                    **I.    JURISDICTION**

17   The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

18   Venue is proper pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding is a core proceeding

19   pursuant to 28 U.S.C. § 157(b)(2)(I) and (J), and this Court has the constitutional authority to enter

20   a final judgment on the Complaint.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015)**;**

21   *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

22

23

24   _____

25   [1] The Pre-Trial Stipulation in this adversary proceeding also references Bankruptcy Code sections
     523(a)(6), 727(a)(3) and 727(a)(5).  But, as discussed below, no evidence supporting claims under

26   these statutes was presented at trial.  Accordingly, the Court deems any cause of action asserted
     under these statutes to have been abandoned by Plaintiffs and judgment will be entered on these

27   claims in favor of Defendant.

28

## II.    PROCEDURAL HISTORY

On March 26, 2014, Defendant filed her voluntary petition under chapter 13 of the Bankruptcy Code (the "Petition Date").  On May 9, 2014, at Defendant's request, her bankruptcy case was converted to chapter 7 of the Bankruptcy Code.  David Seror was appointed the chapter 7 trustee ("Trustee").  On August 4, 2014, Plaintiffs commenced this adversary proceeding by filing a complaint against Defendant as well as Homehealth Solution, Inc. ("HSI"), Shirley B. Soriano ("Soriano"), Chelsea's Home Health Care, Inc. ("CHHC") and Sharon Albert Rios ("Rios").  Plaintiffs asserted claims against the Defendant (and non-debtor HSI) under sections 523 and 727 of the Bankruptcy Code, as well as a cause of action for rescission and restitution.  Plaintiffs asserted claims against all of the named defendants for "fraudulent transfer," "conspiracy, aiding and abetting fraud, breach of fiduciary duty," and for declaratory relief.  Adv. Dkt. 1.

On August 11, 2014, the Trustee filed his "no-asset" report.

On October 10, 2014, the Court dismissed all of the non-debtor defendants and all causes of action not based on sections 523 and 727 of the Bankruptcy Code.  Adv. Dkt. 9.

On March 12, 2015, the Trustee filed his request for withdrawal of his previous "no-asset" report based on his determination that there may be assets to administer.  Case Dkt. 55.  On May 5, 2015, the Trustee sought to employ counsel to assist him based on the Trustee obtaining documents and information from Plaintiffs regarding substantial sums of money paid by Debtor to Zurich American Insurance Company prepetition during the avoidance period.  Case Dkt. 57.

With leave of the Court, on May 1, 2016, Plaintiffs filed their First Amended Complaint (the "FAC") asserting causes of action under sections 523(a)(2), 523(a)(4), 727(a)(2), 727(a)(3), 727(a)(4) and 727(a)(5) against Albert and non-debtor defendant HSI and asserting a cause of action for unjust enrichment against CHHC and Rios.  Adv. Dkt. 92.  On May 30, 2016, Plaintiffs moved for summary judgment on their FAC, which the Court denied following a hearing on August 23, 2016.  Following the issuance of its Order to Show Cause and a hearing thereon, the Court dismissed without prejudice the Fourth Cause of Action for unjust enrichment for lack of subject matter jurisdiction; because this was the only claim asserted against defendants CHHC and Rios, these defendants were dismissed.  Adv. Dkt. 121.

Plaintiffs moved to file a second amended complaint but voluntarily withdrew that motion. Adv. Dkt. 118, 127. The FAC is the operative complaint herein. On March 9, 2017, the parties filed their amended Pre-Trial Stipulation. Adv. Dkt. 135. On April 13, 2017, the Court entered its *Order on Pre-Trial Stipulation* (the "Pre-Trial Order"), which constitutes the operative pre-trial order. Adv. Dkt. 137.

The Court set this matter for trial beginning on May 23, 2017. Due to counsel for the Defendant failing to appear, trial was held on May 24, 2017 and May 25, 2017. At trial, Plaintiffs called Daisy Paredes, Albert, Rios and Annette DiBello-Kelly as witnesses. Defendant called no witnesses but was given the opportunity to cross-examine the Plaintiffs' witnesses and did so. The Court had the opportunity to observe each of the witnesses, evaluate their demeanor, consider their testimony, and assess their credibility.

The Court admitted the following exhibits offered by Plaintiffs: 1A (an unpaginated summary prepared by Plaintiffs' counsel); 1B (pages 1-17 through 1-134 only); 1C (page 1-1 only); 1D (page 1-1.1 only); 1E (pages 1-2 through 1-16); 2 (pages 2-1 through 2-223); 5A (page 5-1 only); 7 (pages 7-1 through 7-53); 8A (pages 8-1 through 8-6 only); 9A (pages 9-1 through 9-38); 10 (an unpaginated document); 11A (pages 11-259 through 11-774 only); 11B (pages 11-775 through 11-795 only); 12 (an unpaginated business records affidavit); 13 (a CD), 14 (electronic filing declaration filed as Case Dkt. 31) and 15 (a CD). Defendant's exhibits B, D, K, L, M, N and P were admitted.

The causes of action asserted in this adversary proceeding are now ripe for decision.

### III. FACTS

### A. Home Health Services, Inc. and Chelsea Home Health Care

In 2004, Albert acquired stock in HSI, a home health care business which sent nurses and therapists to provide services to patients in their homes. After 2007, Albert officially owned 67% of the equity interests in HSI, but effectively was the sole shareholder. Trial Transcript, May 24th at 8-10, 14, 80. Adv. Dkt. 151. Albert had bought out the only other remaining shareholder, but that shareholder had failed to formally transfer her shares to Albert. *Id.* In 2007, Plaintiffs approached Albert seeking to invest in HSI and became shareholders. Trial Transcript, May 24th at

4

22.  It is undisputed that Plaintiffs invested at least $135,000 in January 2008 and received 75,000 shares of stock in HSI.  Pre-Trial Order, ¶1.e.  Plaintiffs continued to invest in HSI, bringing their total investment to between $204,000 and $250,000.  Trial Transcript, May 24th at 23–25; Plaintiffs' Exh. 9A at 9-22.

In 2012, Plaintiffs wanted out of HSI and demanded that Albert return the funds they had invested.  Pre-Trial Order, ¶1.h.  Plaintiffs and Albert executed a settlement agreement requiring Albert to pay Plaintiffs $200,000 in monthly payments of $5,000 for a term of 40 months.  Pre-Trial Order, ¶1.h; Plaintiffs' Exh. 9A at 9-24 - 9-26.  Plaintiffs and Albert agree that Albert made at least thirteen of these monthly payments totaling $65,000 between April 2012 and April 2013. Pre-Trial Order, ¶1.j.  Albert made two additional partial payments in August 2013 and September 2013, bringing the total paid under the settlement agreement to $66,000.  Plaintiffs' Exh. 5A at 5-1. Albert testified that she ceased making payments to Plaintiffs under the settlement agreement because she had no money to make the payments and because HSI's income had decreased due to Medicare denying a high percentage of HSI's claims, as well as the appeals from those determinations.  Trial Transcript, May 24th at 32-33, 181-82; Defendant's Exh. D.

Based on its federal tax return for 2013, HSI had gross revenues of $1,692,475 and total assets of $307,853 but had net operating losses of $113,295.  Plaintiffs' Exh. 8A at 8-1 through 8-6. HSI's operating losses were due in part to $387,446 in salaries and wages and $65,000 in officer compensation paid to employees, including Albert and her daughter, Sharon Rios.  *Id.* At 8-1. Albert acknowledged that a reduction of those salaries would have reduced or eliminated HSI's operating losses.  Trial Transcript, May 24th at 79.  HSI ceased doing business sometime in 2014. Trial Transcript, May 24th at 40.

In June 2013 Albert's daughter, Sharon Rios, purchased CHHC from Shirley Soriano. Pre-Trial Order, ¶1.k.    CHHC performed substantially the same home health care services as HSI. Either prior to, or as a result of, HSI going out of business, approximately 50 patients serviced by HSI began receiving services from CHHC.  Trial Transcript, May 25th at 11, 32-34. Adv. Dkt. 152. CHHC received revenues of approximately $376,000 from services rendered to patients previously serviced by HSI.  Trial Transcript, May 24th at 109; Trial Transcript, May 25th at 11.

**B.      Albert's Insurance Policies and the Prepetition and Postpetition Transfers**

At some point prepetition, Albert worked as a life insurance agent selling life insurance policies, and is "very familiar" with such policies.  Trial Transcript, May 24th at 82-83.  As of the Petition Date, Albert owned a life insurance policy issued by Zurich American Life Insurance (the "ZALICO Policy").  Pre-Trial Order, ¶1.b.  The ZALICO Policy is a "Flexible Premium Adjustable Life Insurance Policy with Index-Linked Interest Options."  Plaintiffs' Exh. 2 at 2-4.  By its express terms, the ZALICO Policy accrued value as premiums were paid and, as value accrued, Albert could access the policy value through loans, partial withdrawals or surrender of the policy.  Plaintiff's Exh. 2 at 2-26 through 2-31, 2-134, 2-138, 2-160, 2-190, 2-200.  Albert testified she did not know that she could borrow against the ZALICO Policy or that it had a surrender value.  Trial Transcript, May 24th at 83-84.

Albert purchased the ZALICO Policy in November 2013 through an insurance broker named Wolfgang Steinberg.  Trial Transcript, May 24th at 83, 87.  Albert wrote two checks to ZALICO drawn on her personal bank account:  Check No. 1133 dated November 24, 2013 for $191,723.66 and check no. 1132 dated March 23, 2014 for $88,800.  Trial Transcript, May 24th at 84; Plaintiffs' Exh. 1-C at 1-1; Plaintiff's Exh. 2 at 2-67, 2-70.  Albert testified that these checks represented the premium payments for the first three years of the ZALICO Policy.  Trial Transcript, May 24th at 84-85.  Albert testified that these premium payments were funded by Steinberg who would deposit funds into her checking account on the same day the checks were drawn on the account.  Trial Transcript, May 24th at 84-89.  Albert's monthly bank statement for November 2013 lists a deposit in the amount of $191,738.66 from Steinberg Equity Partners LLC on November 26, 2013, two days after check no. 1133 was dated and three days before that same check was honored.  Plaintiffs' Exh. 1E at 1-5, 1-6.  Albert's bank statement for March 2014 lists a deposit in the amount of $88,815 from Steinberg Equity Partners LLC on March 25, 2014, the day before the Petition Date, and two days after check no. 1132 in the amount of $88,800 was dated and the same date that check was honored.  Plaintiffs' Exh. 1E at 1-11.  Albert testified that she received a phone call from Mr. Steinberg informing her that he had just deposited $88,000 into her account.  Trial Transcript, May 24th at 88-89.

Albert also wrote three checks drawn on her personal bank account to "Home Health Consulting" for $25,000, $10,000 and $25,000 all of which were (initially) honored on the March 26, 2014 Petition Date and one day after Steinberg deposited $88,815 into Albert's account. Plaintiffs' Exh. 1-D at 1-1.1, 1-E at 1-11, 1-12; Trial Transcript, May 24th at 89-91.  The following day the three Home Health Consulting checks bounced.  Plaintiffs' Exh. 1-E at 1-12.

Albert also testified that beginning in 2010 she had to make monthly payments of $10,000 to pay back loans she obtained from what she described at times as "friends" and at times as "loan sharks." Trial Transcript, May 24th at 26, 127.  As of the Petition Date, Albert testified that she owed $250,000 to loan sharks who were charging her 3.0% per month in interest.  *Id.*, at 27, 127.

**C.     Postpetition Events**

Albert filed her Schedules and her Statement of Financial Affairs ("SOFA") on April 9, 2014.  Plaintiffs' Exh. 7; Case Dkt. 12-24, 31.  Albert did not amend either her Schedules or her SOFA at any time during her case, although upon conversion to chapter 7 she did supplement her Schedules with a schedule of debts incurred during the pendency of her chapter 13 case.  Case Dkt. 40.  On her Schedule B, in response to question 9 regarding interests in insurance policies, Albert listed "Farmers Insurance" but did not disclose the ZALICO Policy.  Plaintiffs' Exh. 7 at 7-9; Case Dkt. 15; Pre-Trial Order, ¶1.b.  On her Schedule F, she did not disclose any of the high interest personal loans owed to her friends or to loan sharks.  Plaintiffs' Exh. 7; Case Dkt. 17.  On her SOFA, in response to question 3.a. (directed to debtors with primarily consumer debts) requiring a list of "all payments on loans, installment purchase of goods or services, and other debtors to any creditor made within 90 days immediately preceding" the Petition Date, Albert listed "NONE;" in response to question 3.b. (directed to debtors whose debts are not primarily consumer debts) requiring a list of "each payment or other transfer to any creditor made within 90 days immediately preceding the" Petition Date, Albert listed "NONE;"  in response to question 10 requiring a list of "all other property, other than property transferred in the ordinary course of the business . . . within two years immediately preceding the" Petition Date, Albert listed "NONE."  Plaintiffs' Exh. 7 at 7-28, 7-31; Case Dkt. 23.  Nowhere on her SOFA did Albert list the $280,523 drawn from her

1  personal checking account and paid to ZALICO.  Nowhere on her SOFA did Albert list the

2  $60,000 in checks made out to "Home Health Consulting," which bounced postpetition.

3       Albert testified that she did not list the ZALICO Policy or the payments to ZALICO on her

4  Schedules or her SOFA because her insurance agent at Steinberg told her she did not have to

5  disclose them in her bankruptcy.  Trial Transcript, May 24th at 88, 135.  According to Albert, the

6  insurance agent advised her not to disclose them because "It's not yours.  It's not your money" and

7  because Steinberg's deposits into Albert's bank account "washed out" the transfers.  *Id*.  When

8  asked whether she had consulted her bankruptcy counsel about whether to disclose the ZALICO

9  payments and Policy, Albert testified that she had not done so.  Trial Transcript, May 24th at 88.

10  Albert also testified that she did not know that Steinberg may have been defrauding ZALICO and

11  that she was a party to that scheme; Albert rationalized that if the insurance broker had only funded

12  one year's worth of premiums it would be fraud, but because Steinberg had funded three years'

13  worth of premiums, it was not fraud.  Trial Transcript, May 24th at 135-37.  She also testified that

14  she did not schedule the ZALICO Policy because she did not think it was important although she

15  did schedule the Farmers life insurance policy because she had it for years and had "accumulated"

16  on it.  Trial Transcript, May 24th at 92-93.

17       On her Schedule B, in response to question 13 regarding stock and interests in incorporated

18  and unincorporated businesses, Albert wrote "NONE."  Plaintiffs' Exh. 7 at 7-10; Case Dkt. 15.

19  On her SOFA, in response to question 18 requiring her to list the "names, addresses, taxpayer-

20  identification numbers, nature of the businesses, and beginning and ending dates of all businesses"

21  of which she was an officer or shareholder, Albert listed HSI, but did not list any beginning or

22  ending dates for HSI.  Plaintiffs' Exh. 7 at 7-34; Case Dkt. 23.  Albert testified that she did not list

23  HSI on her Schedule B because (i) she did not think it was an asset and (ii) she thought it was

24  worthless.  Trial Transcript, May 24th at 77, 80-82.  Despite having revenues of nearly $1.7 million

25  in 2013, Albert testified to her belief that nobody would buy HSI because of the Medicare denials.

26      **D.**    **The ZALICO Avoidance Action and ZALICO's Relief from Stay Motion**

27       After withdrawing his no-asset report, on February 5, 2016, the Trustee filed an avoidance

28  complaint against ZALICO seeking to avoid and recover (i) the $191,723 premium payment as an

1  avoidable prepetition fraudulent transfer and (ii) the $88,800 premium payment as an avoidable

2  postpetition transfer.  *See* Case Dkt. 68 and Dkt. 1 in Adv. No. 16-ap-01016-MB (the "ZALICO

3  Avoidance Action").  On February 12, 2016, ZALICO filed its motion for relief from the automatic

4  stay to allow ZALICO to terminate the ZALICO Policy based on an alleged failure to pay the 2015

5  premium and for direction on whether to pay the surrender value of the ZALICO Policy (alleged to

6  be $10,297 as of November 28, 2015 based on the $88,800 premium payment having been made,

7  the "Cash Surrender Value") to the Trustee or to Albert.  Case Dkt. 70, n.3.  The Trustee opposed

8  the ZALICO motion for relief from stay and the Court eventually granted the motion, allowing

9  ZALICO to terminate the Policy but directing ZALICO to refrain from distributing the $10,297

10  Cash Surrender Value until further order of the Court.  Case Dkt. 77.

11      On July 5, 2016, the Court approved a settlement of the ZALICO Avoidance Action under

12  which (i) ZALICO paid the estate $71,040, (ii) the Trustee dismissed the ZALICO Avoidance

13  Action and (iii) the Trustee released any claim of the estate to the $10,297 cash surrender value of

14  the ZALICO Policy.  Case Dkt. 82, 79 at 13.

15      On May 8, 2017, the Trustee filed his Final Report and Account indicating that the $71,040

16  settlement payment by ZALICO was the only funds received by the estate during this bankruptcy

17  case.  Case Dkt. 116.

18                          **IV.    LEGAL ANALYSIS**

19          **A.    Dismissal of Claims Asserted Against HSI**

20      Plaintiffs assert causes of action under sections 523 and 727 of the Bankruptcy Code against

21  both Albert and HSI.  Section 727 grants a discharge only to debtors; nothing in section 727 could

22  be construed as granting a discharge to a non-debtor.  Defendant HSI is not a debtor and is not

23  eligible to receive a discharge in the underlying bankruptcy case.  Because HSI is not eligible to

24  receive a discharge, Plaintiffs' causes of action seeking to deny HSI a discharge are unnecessary

25  and claims on which no relief can be granted.  As such, the Court dismisses the First, Second and

26  Third Causes of Action against HSI with prejudice.

27

28

**B.    Section 727(a) Claims Against Albert**

"In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)).  The party objecting to a debtor's discharge bears the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied.  *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007).

**1.    Omissions From The Schedules and SOFA Under Sections 727(a)(2) and 727(a)(4).**

Section 727(a)(2) provides that the "court shall grant the debtor a discharge unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-- (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition. 11 U.S.C. § 727(a)(2).  "A party seeking denial of discharge under § 727(a)(2) must prove two things: '(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property.'"  *Retz*, 606 F.3d at 1200 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir.1997)).

Section 727(a)(4) provides that the "court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently, or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4).  Section 727(a)(4) requires a showing that "(1) Debtor made such a false statement or omission, (2) regarding a material fact, and (3) did so knowingly and fraudulently." *Khalil*, 379 B.R. at 172.

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath. . . That said, a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A)." *Khalil*, 379 B.R. at 172-73. That a concealed asset or concealed transfer

1  would not be property of the estate, or would have little value, does not necessarily mean that the

2  concealment is immaterial:

> [A]n omission or misstatement relating to an asset that is of little value or
>
> that would not be property of the estate is material if the omission or
>
> misstatement detrimentally affects administration of the estate. "In
>
> determining whether or not an omission is material, the issue is not merely
>
> the value of the omitted assets or whether the omission was detrimental to
>
> creditors. Even if the debtor can show that the assets were of little value or
>
> that a full and truthful answer would not have directly increased the estate
>
> assets, a discharge may be denied if the omission adversely affects the
>
> trustee's or creditors' ability to discover other assets or to fully investigate the
>
> debtor's pre-bankruptcy dealing and financial condition. **Similarly, if the**
>
> **omission interferes with the possibility of a preference or fraudulent**
>
> **conveyance action the omission may be considered material**." 6 King,
>
> Collier on Bankruptcy ¶ 727.04[1][b].

16  *In re Wills*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999) (emphasis added); *see also In re Amiri*, 2018

17  WL 989501, at *4-5 (B.A.P. 9th Cir., Feb. 13, 2018) ("even an omission of a non-asset is material

18  if the omission negatively impacts a trustee's administration of the estate;" rejecting argument that

19  only omissions related to property of the estate qualify as material as "[n]either § 727(a)(4) as

20  written nor its caselaw developed elements have a 'property of the estate' component"); *In re*

21  *Loghmani*, 2015 WL 451455, at *5 (B.A.P. 9th Cir., Feb. 2, 2015) (failure to disclose transfer of

22  BMW to debtor's son was material, "[h]ad the Debtor disclosed the transfer, the trustee may have

23  been able to avoid it and liquidate Debtor's interest in the Property for the benefit of his creditors.

24  *See* § 547(b)").

25      The omission of assets from the schedules, or transfers from the SOFA, can constitute a

26  concealment under section 727(a)(2) as well as a false oath under section 727(a)(4). *Retz*, 606 F.3d

27  at 1196 ("A false statement or an omission in the debtor's bankruptcy schedules or statement of

28  financial affairs can constitute a false oath."); *In re Gronlund*, 656 F. App'x. 851, 852 (9th Cir.

1  2016) (failure to schedule property supported denial of discharge under section 727(a)(2) and

2  (a)(4)); *In re Thomsen*, 172 F.3d 877 (Table), 1999 WL 140607, *1 (9th Cir., Mar. 15,1999) ("The

3  record is replete with examples of concealments that also constitute false oaths").

4      A debtor has a duty to prepare her statement of financial affairs and schedules "carefully,

5  completely, and accurately." *Cusano v. Klein*, 264 F.3d 936, 945–946 (9th Cir.2001).  The "duty to

6  assure accurate schedules of assets is fundamental because the viability of the system of voluntary

7  bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial

8  affairs." *Searles v. Riley (In re Searles)*, 317 B.R. 368, 378 (B.A.P. 9th Cir. 2004).  "Adopting a

9  cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret

10 out the truth is not acceptable conduct by debtors or their counsel." *AT & T Universal Card Servs.*

11 *Corp. v. Duplante (In re Duplante)*, 215 B.R. 444, 447 (B.A.P. 9th Cir. 1997).  *See also In re*

12 *Song*, 2011 WL 6934462, at *11 (B.A.P. 9th Cir., Sept. 30, 2011) ("[T]he Debtor had a clear duty

13 to disclose the payments in response to Questions 3 and 10 on the statement of financial affairs").

14              **(a).    Concealment and Omission of Material Facts**

15     Plaintiffs contend that Albert violated Bankruptcy Code sections 727(a)(2) and 727(a)(4) by

16 concealing and failing to disclose on her bankruptcy filings (i) the $280,253 in premium payments

17 made to ZALICO on the eve of her bankruptcy case, (ii) her ownership of the Zalico Policy,

18 (iii) her ownership of HSI, and (iv) the $250,000 in unsecured debt owed to alleged friends and

19 loan sharks.[2]

20 _____

21 [2]  Plaintiffs' FAC contains no allegations regarding the ZALICO Policy or the premium payments.
22 The Pre-Trial Order, however, includes Albert's stipulation that she owned the ZALICO Policy and
   failed to disclose it on her "bankruptcy petition" and included as disputed issues of law and fact
22 whether Albert omitted material assets and whether material assets were fraudulently transferred
23 from the Debtor.  Pre-Trial Order, ¶¶ 1-3.  Pre-trial orders have the effect of amending the
   pleadings, and they "will be liberally construed to permit consideration of any issues that are
24 embraced within [their] language."  *In re Hunt*, 238 F.3d 1098, 1102 (9th Cir. 2001) (quoting
25 *ACORN v. City of Phoenix*, 798 F.2d 1260, 1272 (9th Cir.1986)).  *See also In re Cummings*, 2012
   WL 4747218, at *7 (B.A.P. 9th Cir., Oct. 3, 2012) ("The Cummings complain that the bankruptcy
26 court considered allegations not presented by the UST in the complaint as grounds for denial of
27 their discharge under § 727(a)(4)(A) . . .  As the UST points out, however, the Cummings had
   agreed in the joint pretrial statement to allow the UST to submit the employer payment declaration,
28                                                                                (Continued...)

1    The Court concludes that Albert's failure to disclose in her SOFA the $280,253 in premium

2    payments made to ZALICO was a concealment within the meaning of Bankruptcy Code section

3    727(a)(2) and a false oath within the meaning of Bankruptcy Code section 727(a)(4).  The

4    $191,738.66 premium payment to ZALICO was paid from Albert's bank account on November 29,

5    2013, which is within two years of the Petition Date.  By any measure, it was not a transfer "in the

6    ordinary course of the business or financial affairs of the debtor" so as to qualify for the exception

7    listed in question 10 on the SOFA.  As a transfer of funds from her personal bank account, Albert

8    was required to list this transfer in response to question 10 on the SOFA.  The $88,800 premium

9    payment was likewise paid from her personal bank account just one day before the Petition Date

10   and therefore was required to be listed in response to both question 3 and question 10 on the SOFA.

11   Albert failed to disclose these two premium payments anywhere on her SOFA.  These omissions

12   were unquestionably material.  Upon learning of the premium payments, the Trustee withdrew his

13   no-asset report, hired counsel and sued ZALICO to recover the $280,523 in payments.  Eventually

14   the Trustee settled with ZALICO and received $71,040 to dismiss his lawsuit – essentially, these

15   undisclosed transfers were the only assets of this estate.  Albert's omission of the premium

16   payment transfers on her SOFA directly interfered with the Trustee's ability to investigate and

17   recover avoidable transfers.  These not only constitute a concealment under section 727(a)(2) but a

18   false oath under section 727(a)(4) because the SOFA was filed under penalty of perjury.

19   _____

20   (...Continued)

21   as well as the entire file in their bankruptcy case, as evidence at trial. The bankruptcy court was
     entitled to consider any evidence presented to it at trial and to base its decision on any grounds

22   within the claims alleged, supported by the evidence").  The issues related to the ZALICO Policy
     and premium payments were "embraced within" the Pre-Trial Order and preserved for trial.

23   Moreover, Albert defended herself on these issues, expressly addressing them in both her pre-trial
     brief and post-trial brief.  Adv. Dkt. 139 at 13:3-13; Adv. Dkt. 154 at 18-20.  Albert's Exhibit List

24   included evidence on these issues including her bank statements as Exhibit I and a civil complaint

25   styled *Transamerica Life Insurance Company v. Steinberg Equity Partners, LLC et al.* filed in
     United States District Court, as Exhibit J.  Adv. Dkt. 140 at 2.  Counsel for Albert cross-examined

26   Albert extensively about the ZALICO Policy and the premium payments.  Trial Transcript, May

27   24th at 173-180.  Thus, Albert had a full and fair opportunity to defend herself—and vigorously
     defended herself—regarding these issues before and during trial.

28

The Court likewise concludes that Albert's failure to disclose in her Schedule B the Zalico Policy was also a concealment under section 727(a)(2) and a false oath under 727(a)(4). Albert stipulated that she owned the ZALICO Policy on the Petition Date but nevertheless failed to disclose it in her Schedules, which are also signed under penalty of perjury. Pre-Trial Order, ¶1.b. This omission was material. By its express terms, the Policy accrued value as premiums were paid and Albert testified that three years' worth of premiums had been paid prior to the Petition Date. The express terms of the Policy provide formulas for determining the cash surrender value of the Policy at any point in time by, essentially, deducting the amount of unpaid premiums that have come due from the value of the premiums already paid. In 2016, ZALICO asserted in its motion for relief from stay that as of November 28, 2015, the 2015 premium payment had not been made and the Cash Surrender Value therefore was $10,297. If Albert had disclosed the ZALICO Policy on her Schedule B in 2014, before the November 2015 premium came due, the Cash Surrender Value may have been higher, affording the Trustee an alternative way to liquidate the ZALICO Policy for the benefit of the estate. Because Albert failed to schedule the ZALICO Policy, the Trustee was deprived of the opportunity to investigate the cash surrender value of the Policy in 2014. While Plaintiffs failed to establish the actual cash surrender value of the Policy on the Petition Date, they nevertheless provided sufficient evidence to determine that the omission of the ZALICO Policy from Schedule B was material.

The Court concludes that that Albert's failure to disclose in her Schedule B her interest in HSI constitutes a false oath within the meaning of section 727(a)(4), but is not persuaded that Albert concealed HSI for purposes of section 727(a)(2). Albert testified that as of the Petition Date she was the sole shareholder of HSI even though a minority shareholder Albert bought out failed to transfer back her shares. Consistent with Albert's testimony, HSI's 2013 tax return lists Albert as HSI's 100% shareholder. Plaintiffs' Exh. 8A at 8-6. Thus, the uncontroverted evidence demonstrates that Albert was the controlling, if not the only shareholder of HSI as of the Petition Date. Nevertheless, Albert answered "NONE" in response to question 13 on Schedule B regarding whether she had any stock or equity interests. Notably, Schedule B contains no language limiting the question only to stock or equity interests "of value." All equity interests must be disclosed.

1  Further, the false oath pertains to a material fact: the existence of the equity interest.  Albert

2  contends that that HSI asserted various deductions and losses in excess of its income in 2013.  But

3  HSI's tax return for 2013 lists approximately $300,000 in assets and $1.7 million in gross revenues.

4  The disclosure of all equity interests in Schedule B is required so that a trustee may make his or her

5  own evaluation of a debtor's assets.  If Albert believed that the equity interest had no value, she

6  should have listed the stock, but listed the value of the stock as "$0.00."

7        Albert's false oath regarding her equity in HSI, however, does not necessarily constitute a

8  concealment within the meaning of section 727(a)(2).  Although she did not list HSI on Schedule

9  B, she *did* list HSI in the SOFA, in response to a question about whether she was an officer,

10  director or significant shareholder of a corporation.  Albert offers no explanation for why she listed

11  HSI on her SOFA but not her Schedule B.  Nevertheless, in light of the her disclosure of HSI in her

12  SOFA, the Court cannot conclude for purposes of Bankruptcy Code section 727(a)(2) that Albert

13  concealed her interest in HSI.

14        Finally, the Court rejects Plaintiffs' argument that Albert's omission from Schedule F of

15  approximately $250,000 in loans she received from friends and loan sharks satisfies the

16  requirements of either section 727(a)(2) or 727(a)(4).  Although the Schedules required the debtor

17  to disclose all of her debts, Plaintiffs fail to demonstrate how the omission of these unsecured

18  creditors had any impact on the administration of her bankruptcy estate.  Accordingly, the Court

19  concludes this omission was not material and cannot be a basis for denying her discharge under

20  section 727(a)(4).  Moreover, because concealment under section 727(a)(2) is focused on the

21  concealment of assets, rather than debts, section 727(a)(2) does not apply here.

22                    **(b).    Intent**

23        The foregoing concealments and false oaths cannot satisfy sections 727(a)(2) or 727(a)(4)

24  unless Plaintiffs demonstrate that Albert committed them with the requisite intent.  For purposes of

25  section 727(a)(2), it is sufficient if Plaintiffs demonstrate that Albert's intent was either to hinder or

26  to delay or to defraud her creditors or an officer of the estate; "[i]n other words, proof of mere

27  intent to hinder or to delay may lead to denial of discharge."  *In re Beverly*, 374 B.R. 221, 242-43

28  (B.A.P. 9th Cir. 2007).  Determining a debtor's intent "requires the trier of fact to delve into the

1   mind of the debtor." *Searles*, 317 B.R. at 379.  To accomplish this, the court may infer a debtor's

2   intent from the circumstances surrounding the transactions. *Emmet Valley Assocs. v. Woodfield (In*

3   *re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992).  These circumstances include the relative

4   sophistication and life experiences of the debtor. *In re Thomsen*, 172 F.3d 877 (Table), 1999 WL

5   140607, *1 (9th Cir. Mar. 15, 1999) ("Ample evidence supports the bankruptcy court's finding of

6   fraudulent intent, especially given Steven Thomsen's extensive education, multiple degrees and

7   experience as a real-estate broker"); *In re Maring*, 338 F. App'x. 655, 658 (9th Cir. 2009)

8   (affirming bankruptcy court's finding of fraudulent intent based, in part, on debtor's status as a

9   "well-educated, long-experienced and sophisticated businessman"); *In re Gronlund*, 2014 WL

10  4090433, at *7 (B.A.P. 9th Cir., Aug. 19, 2014) ("The combination of Debtor's business

11  sophistication and the fact that the 'only asset of value' was omitted support the bankruptcy court's

12  finding that Debtor's concealment of the Mexican Note was to hinder, delay or defraud his creditors

13  within the meaning of § 727(a)(2)").

14      Based on all of the circumstances surrounding Albert's purchase of the ZALICO Policy and

15  her understanding of the scheme perpetrated by her insurance broker to prepay three years' worth

16  of premiums to collect a 10% broker's commission, and in light of her experience as a former life

17  insurance agent, it is evident Albert concealed the premium payments and her ownership of the

18  ZALICO Policy to hinder the Trustee from investigating any of the circumstances surrounding the

19  Policy.  Her intent was to make it difficult for the Trustee to discover and investigate an asset she

20  knew she owned and to delay his discovery of the $280,523 in premium payments out of her

21  personal bank account.  The Court did not find her equivocal testimony regarding whether she

22  "owned" the ZALICO Policy credible in light of her experience and sophistication as a former life

23  insurance agent.  Her testimony that she relied on advice from the insurance broker from whom she

24  purchased the Policy to determine whether she was required to disclose it in her bankruptcy—a

25  question she testifies she did not ask of her bankruptcy lawyer—is not credible.

26      Similarly, as a former life insurance agent, she should have known that the ZALICO Policy

27  was the type of policy that would accrue value as premiums were paid and that prepayment of three

28  years' worth of premiums would accelerate this accumulation.  Her testimony that she did not

1    know the Policy likely had a cash surrender value as of the Petition Date due to the prepayment of

2    three years' worth of premiums was not credible.  Albert concealed the existence of the ZALICO

3    Policy and its potential value to hinder the Trustee and prevent him from liquidating it for the

4    benefit of her creditors.  Plaintiffs presented ample evidence that Albert concealed the ZALICO

5    Policy and the premium payments with the intent to hinder or delay the Trustee and with the intent

6    of defrauding her creditors of any value therein.  Plaintiffs have satisfied section 727(a)(2) based on

7    Albert's concealment of the ZALICO Policy and the $280,523 in premium payments from her

8    personal bank account on the eve of bankruptcy.

9      For purposes of section 727(a)(4), Plaintiffs must demonstrate that Albert acted "knowingly

10   and fraudulently."  11 U.S.C. § 727(a)(4).  A debtor "acts knowingly if he or she acts deliberately

11   and consciously." *Retz*, 606 F.3d at 1198 (quoting *Khalil*, 379 B.R. at 173).  A debtor acts

12   fraudulently if she: (1) made omissions or misstatements in her schedules; (2) that she knew were

13   false at the time she made them; and (3) made them with the intention and purpose of deceiving her

14   creditors. *Retz*, 606 F.3d at 1199 (quoting *Khalil*, 379 B.R. at 173).  "An example of circumstantial

15   evidence suggesting an intent to defraud may be found where the debtor fails to clear up all

16   inconsistencies and omissions, even having had an opportunity to do so, such as by filing amended

17   schedules."  *In re DenBeste*, 2012 WL 5416513, at *7, (B.A.P. 9th Cir., Nov. 6, 2012).

18     Albert acted deliberately and knowingly when she listed "NONE" in response to question

19   13 on Schedule B regarding her ownership of equity interests and when she omitted the ZALICO

20   Policy from her Schedule B.  Albert's testimony demonstrates she knew at all times that she owned

21   a controlling equity interest in HSI on the Petition Date.  As noted above, the Court did not find

22   Albert credible when testifying regarding the ZALICO Policy.  As a former life insurance agent

23   with experience selling life insurance policies, she must have known that she was the owner of the

24   ZALICO Policy.   Albert's testimony demonstrates she understood the $280,523 in premium

25   payments were made from her personal bank account and she essentially admits that she was

26   contriving with her insurance broker to create a paper trail of the payments through her personal

27   account.  As a former life insurance agent, she must have understood that as the owner of the

28   Policy, ZALICO was her creditor and that she (not her insurance broker) was obligated to make the

premium payments.  As such, Albert knew the premium payments were payments made from her personal bank account to her creditor.  Her omission of these sizable payments from her SOFA was deliberate and knowing and not a mere oversight.  Albert's false statements and omissions regarding the premium payments, the ZALICO Policy and her equity interest in HSI were deliberate and knowing.

Albert knew her answer of "NONE" in response to questions 3 and 10 on her SOFA, and in response to question 13 on her Schedule B were false.  She also knew that she owned more life insurance policies on the Petition Date than just the Farmers' policy she disclosed on Schedule B.  At no point did Albert amend Schedule B or her SOFA to correct these false statements and omissions, even after the Trustee sued ZALICO and ZALICO moved for relief from the automatic stay.  She also knew that she was the controlling shareholder of HSI on the Petition Date but never amended Schedule B to correct the false statement that she had no equity interests in any corporations.

Similarly, Albert's explanation that she did not disclose the $280,523 in premium payments from her personal bank account because "it wasn't her money" was not credible.  She knew the payments came from her account and testified that the payments had to come from her account rather than directly from her insurance agent.  Albert did not disclose the premium payments because she was hoping to discharge any personal liability under the ZALICO Policy in her chapter 7 while simultaneously insuring the Trustee never discovered either the Policy or the premium payments.  The Court also did not find her testimony that she did not receive any benefit from the acquisition of the Policy to be credible.  Based on the totality of the circumstances it is evident that Albert did not want the Trustee investigating the circumstances surrounding the ZALICO Policy or HSI and potentially monetizing her interest in the Policy or in HSI.  Albert made these false oaths with the intent to hide and protect these assets from the Trustee and her creditors.  Plaintiffs have satisfied section 727(a)(4) regarding Albert's false oaths related to the ZALICO Policy, the premium payments and her ownership interest in HSI.

1  Based on the foregoing, Albert's discharge is denied under both section 727(a)(2) due to

2  concealment and section 727(a)(4) due to false oaths.[3]

3

4  ### 2. The "Transfer" of HSI Patients and Revenues to CHHC under Section 727(a)(2)

5  The principal focus of Plaintiffs' case is their theory that Albert "transferred" HSI patients

6  and the revenues generated on account of those patients from HSI to her daughter's company,

7  CHHC, in order to defraud her creditors.  Plaintiffs do not allege that Albert transferred any

8  property of the estate after filing her bankruptcy petition.  Accordingly, they must establish that she

9  transferred property *of the debtor* during the year preceding the Petition Date.  11 U.S.C.

10  § 727(a)(2)(A) (". . . property of the debtor . . .").  Plaintiffs elicited testimony from Rios and

11  Albert that numerous patients of HSI became patients of CHHC.  Trial Transcript, May 25th at

12  11:1-17; Trial Transcript, May 24th at 38:5-11, 39:25-40:20.  Plaintiffs also offered testimony that

13  CHHC derived approximately $376,000 in revenues from patients who were once patients served

14  by HSI.  Trial Transcript, May 24th at 109:12-18.

15  Plaintiffs, however, have stipulated that HSI is a corporation into which they invested funds

16  and received 75,000 shares of stock and that prior to investing they requested HSI's articles of

17  incorporation and corporate by-laws.  Pre-Trial Order, ¶ 1(f), (e).  The Settlement Agreement,

18  admitted as part of Plaintiffs' Exhibit 9A, which Plaintiffs have alleged they signed, identifies HSI

19  as a California corporation founded in 2003 with a registration number of C2533885.  Plaintiffs

20

21  _____

22  [3]  Plaintiffs also alleged that Albert failed to disclose all of her income in her Schedule I and therefore should be denied her discharge under section 727(a)(2) and (a)(4).  Plaintiffs, however, failed to present sufficient evidence to allow the Court to determine that Albert's income was

23  meaningfully different than what was disclosed on Schedule I.  In their post-trial brief, Plaintiffs assert they demonstrated through "testimony and documentary evidence" that Albert's average

24  monthly income in the six months preceding the Petition Date was more than four times greater than the amount disclosed on Schedule I, but Plaintiffs failed to direct the Court to any specific

25  testimony supporting this claim other than Albert's testimony that certain checks issued to her on HSI bank accounts were for expense reimbursements.  Adv. Dkt. 153 at 4, 6:6 and Trial Transcript,

26  May 24th at 143-44.  This evidentiary record is too slight to determine that Albert's income was

27  four times greater than disclosed on Schedule I.

28

1    offered the 2013 federal tax return filed by HSI identifying Albert as the "100% shareholder."

2    Plaintiffs' Exh. 8-A.  Albert testified that she was either the sole, or the controlling, shareholder of

3    HSI.  Trial Transcript, May 24th at 8:12-10:15.  Thus, the uncontroverted evidence establishes that,

4    during the year preceding the Petition Date, HSI was a corporation and therefore a separate legal

5    entity from Albert.  "Ordinarily, a corporation is regarded as a legal entity separate and distinct

6    from its stockholders, officers and directors." *Tatung Company, Ltd. v. Shu Tze Hsu*, 217 F.Supp.3d

7    1138, 1175 (C.D. Cal. 2016) (quoting *Robbins v. Blecher*, 52 Cal. App. 4th 886, 892 (1997)).

8          The revenues associated with the patients that transferred from HSI to CHHC may have

9    been assets of HSI (although Plaintiffs failed to establish that CHHC received payment for any

10   services rendered by HSI), but they were not assets of Albert, individually.  The assets of HSI

11   never became assets of Albert's bankruptcy estate, only her stock in HSI became property of her

12   bankruptcy estate.  "It is well accepted that a filing by an individual who is an owner of a

13   corporation brings into the estate only his ownership interest and not the assets of the corporation."

14   *In re Young*, 409 B.R. 508, 513 (Bankr. D. Idaho 2009); *see also* 2-101 COLLIER ON

15   BANKRUPTCY ¶101.30[3] (16th ed. 2016) ("[W]hile the individual's interest in the partnership or

16   corporation {which could be a 100 percent interest} would be property of the estate, the assets of

17   the partnership or corporation itself would not be."); *In re Cassis*, 220 B.R. 979, 983 (Bankr. N.D.

18   Iowa 1998) ("Ownership of stock in a corporation does not mean that the corporation is property of

19   the estate . . . Technical, legal distinctions between corporations and shareholders will be respected

20   in bankruptcy cases"); *In re Crabtree*, 554 B.R. 174, 192 (Bankr. D. Minn. 2016) ("As a general

21   matter, property of the estate does not include assets owned by a corporation in which the debtor

22   holds an interest.") *rev'd on other grounds,* 562 B.R. 749 (B.A.P. 8th Cir. 2017).  Therefore, the

23   prepetition "transfer" of patients from HSI to CHHC did not constitute a transfer of "property of

24   the debtor" as required by section 727(a)(2).

25          **3.        Section 727(a)(3) and (a)(5)**

26          The Pre-Trial Order references Bankruptcy Code sections 727(a)(3) and (a)(5) as disputed

27   issues of law to be litigated at trial.  Plaintiffs, however, failed to present any evidence in support of

28   these causes of action.  Plaintiffs also failed to direct the Court to any such evidence in their post-

1   trial briefs.  Adv. Dkt. 153, 155.  The Court therefore assumes Plaintiffs have abandoned these

2   causes of action.  To the extent Plaintiffs intended to base a section 727(a)(5) claim on the theory

3   that approximately 50 patients were transferred from HSI to CHHC, the theory fails because such a

4   "transfer" was not a "loss of assets" of the *debtor* "to meet the *debtor's* liabilities."  11 U.S.C.

5   § 727(a)(5) (emphasis added).

6       **C.    Section 523(a) Claims Against Albert**

7       Plaintiffs' post-trial brief argues their claim against Albert is nondischargeable under

8   section 523(a)(2)(A) based on their contention that Albert transferred patients of HSI to CHHC

9   with the actual intent of defrauding, hindering and delaying the Plaintiffs and her other creditors.

10  Adv. Dkt. 153 at 6-7.

11      Generally, "making out a claim of non-dischargeability under § 523(a)(2)(A) requires the

12  creditor to demonstrate five elements:  (1) the debtor made ... representations; (2) that at the time he

13  knew they were false; (3) that he made them with the intention and purpose of deceiving the

14  creditor; (4) that the creditor relied on such representations; [and] (5) that the creditor sustained the

15  alleged loss and damage as the proximate result of the misrepresentations having been made."  *In

16  re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010).  Because section 523(a)(2)(A) includes the term

17  "actual fraud," the section is broad enough to incorporate a fraudulent conveyance that can be

18  effected without a false representation.  *DZ Bank AG Deutsche Zentral-Genossenschaft Bank v.

19  Meyer*, 869 F.3d 839, 842 (9th Cir. 2017) (citing *Husky Int'l Elecs., Inc. v. Ritz)*, 136 S.Ct. 1581,

20  1587 (2016).

21      Plaintiffs allege, but fail to offer any legal authority to demonstrate, that the "transfer" of

22  HSI patients to CHHC was an actually fraudulent transfer.  As detailed above, the transfer of any

23  patients and the future revenues generated from providing services to those patients might have

24  been a transfer of assets of HSI, but it was not a transfer of assets of Albert.  HSI is a separate legal

25  entity, distinct from Albert.  HSI's assets are not Albert's assets and Plaintiffs have not offered any

26  legal authorities stating that Plaintiffs could collect their claim against Albert from the assets of her

27  corporation, HSI.  Assuming that California's fraudulent transfer law would apply to Plaintiffs'

28  theory, California Civil Code section 3439.01(a) and (m) define a "transfer" as "every mode . . . of

1    disposing or parting with an asset" and define an "asset" as "property of the debtor."  Cal. Civ.

2    Code § 3439.01(a), (m).  Thus, to form the basis of an "actually fraudulent transfer" by Albert, the

3    assets transferred by Albert must be her assets.  "A creditor cannot premise a UFTA claim on a

4    transfer unless the 'the transfer puts beyond [the creditor's] reach property [the creditor] otherwise

5    would be able to subject to the payment of [ ] debt.' *Opperman v. Path, Inc.,* 87 F.Supp.3d 1018,

6    1065 (N.D. Cal. 2014) (quoting *Mehrtash v. Mehrtash*, 93 Cal. App. 4th 75, 80 (2001)).  Plaintiffs

7    fail to demonstrate they had any legal claim to any of HSI's assets or to collect their claim against

8    Albert from the assets of HSI.  Without such a showing, they have failed to demonstrate how they

9    could avoid a transfer of HSI assets as a fraudulent transfer.

10         In *Husky*, the assets of debtor's corporation, Chrysalis, were transferred beyond the reach of

11    a creditor of Chrysalis, Husky.  Based on a particular Texas statute, the debtor was personally

12    liable for Husky's claim against the corporation, and therefore Husky had standing to bring a

13    section 523(a)(2) claim against the debtor based on allegedly fraudulent transfers of the assets of

14    Chrysalis.  *Husky*, 135 S.Ct. at 1485 (citing Tex. Bus. Orgs. Code Ann. § 21.223(b)).  Here,

15    Plaintiffs have not demonstrated they are creditors of HSI and have not identified any California

16    authority that would make the assets of HSI liable for the debts of Albert.  Plaintiffs have failed to

17    establish any "actual fraud" that would make their claim against Albert nondischargeable under

18    section 523(a)(2)(A).[4]

19         The Pre-Trial Order also includes a reference to section 523(a)(6) as a disputed issue of law

20    to be litigated at trial.  But Plaintiffs failed to present any evidence in support of this cause of

21

22

---

23    [4]  Previously, Plaintiffs advanced a different theory under section 523(a)(2)(A) arguing that Albert
      fraudulently induced them to enter into the Settlement Agreement and had no intention of

24    performing under that agreement.  This theory is not mentioned in Plaintiffs' post-trial briefs and
      presumably has been abandoned by Plaintiffs.  Adv. Dkt. 153 and 155.  In any event, the parties

25    have stipulated that Albert made 13 payments totaling at least $65,000 to Plaintiffs under the
      Settlement Agreement.  Pre-Trial Order, ¶ 1.j.  While this amount is less than the $200,000 agreed

26    upon, it is not an insignificant amount.  Also, making such payments over more than one year after
      entering into the settlement suggests Albert intended to, and tried to, perform under the Settlement

27    Agreement.

28

1   action.  Plaintiffs also failed to direct the Court to any such evidence in their post-trial briefs.  Adv.

2   Dkt. 153, 155.  The Court assumes Plaintiffs abandoned this cause of action.

3                                      **V.     CONCLUSION**

4          For all of the foregoing reasons, the Court will enter judgment in favor of Plaintiffs,

5   denying Albert's discharge under Bankruptcy Code sections 727(a)(2) and section 727(a)(4).  The

6   Court will enter judgment in favor of the Defendant on all other claims, including Plaintiffs' claim

7   that Albert's debt to them is non-dischargeable under Bankruptcy Code section 523(a)(2)(A).

8

9                                          # # #

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Date: March 29, 2018

24                                          Martin R Barash
                                           United States Bankruptcy Judge
25

26

27

28

                                            23